*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALASKA ASSOCIATION OF NATUROPATHIC PHYSICIANS, | ) ) ) | Supreme Court No. S-16530 |
| Appellant, | ) ) | Superior Court No. 3AN-14-07022 CI |
| v. | ) ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT OF COMMERCE, COMMUNITY & ECONOMIC DEVELOPMENT, DIVISION OF CORPORATIONS, BUSINESS & PROFESSIONAL LICENSING, | ) ) ) ) ) ) ) ) | No. 7229 – March 16, 2018 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Joe P. Josephson, Josephson Law Offices, LLC, Anchorage, for Appellant. Robert C. Auth, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I.    INTRODUCTION

An association representing naturopathic physicians challenges a new regulation that effectively forbids naturopaths from using and prescribing injectable vitamins and minerals. The association argues that the statutory definition of naturopathy includes the use of dietetics, that dietetics include injectable vitamins and minerals obtained by pharmaceutical prescription, and that the statutory restrictions on the practice of naturopathy prohibit the use of only prescription *drugs*, not all prescription *medicines*. But we conclude that the statutory text, the larger statutory context, and the legislative history together suggest that the legislature did not intend to grant prescriptive authority to naturopaths. We therefore affirm the superior court's decision to grant summary judgment against the association on this issue.

## II.    FACTS AND PROCEEDINGS

### A.    Regulatory Backdrop

Naturopathy is a method of treating disease "that avoids drugs and surgery and emphasizes the use of natural agents (such as air, water, and herbs) and physical means (such as tissue manipulation and electrotherapy)."[1] Alaska first established a licensing structure for naturopaths in 1986, codified at AS 08.45.[2] This statute defines the practice of naturopathy, provides requirements for obtaining and maintaining a naturopathy license, and establishes restrictions on the practice of naturopathy.[3] It defines naturopathy to include a range of practices: "hydrotherapy, dietetics,

---

[1]    *Naturopathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/naturopathy (last visited Feb. 28, 2018).

[2]    Ch. 56, SLA 1986.

[3]    *See generally* AS 08.45.010-.200.

electrotherapy, sanitation, suggestion, [and] mechanical and manual manipulation for the stimulation of physiological and psychological action to establish a normal condition of mind and body."[4]  And it defines dietetics to "include[] herbal and homeopathic remedies."[5]  The statute forbids naturopaths from engaging in three types of conduct: "A person who practices naturopathy may not (1) give, prescribe, or recommend in the practice (A) a prescription drug; (B) a controlled substance; (C) a poison; (2) engage in surgery; (3) use the word 'physician' in the person's title."[6]

In 1992 the State conferred authority to promulgate regulations implementing AS 08.45 on the Department of Commerce, Community, and Economic Development.[7]  The Department adopted regulations implementing the naturopathy statute in 1994.  Among those regulations were definitions of some of the key statutory terms:

> (1) "dietetics" includes the use of nutritional therapies, nutritional counseling, nutritional substances, vitamins, minerals, and supplements to promote health and to diagnose, treat, and prevent disease, illness, and conditions;
>
> . . . .
>
> (3) "herbal remedy" includes medicines derived from or a concentrate or extract of a plant, tree, root, moss, fungus, or other natural substance; "herbal remedy" does not include a controlled substance;
>
> . . . .

---

[4]     AS 08.45.200(3).

[5]     *Id.*

[6]     AS 08.45.050.

[7]     Ch. 87, § 3, SLA 1992; *see* AS 08.45.100.

(8) "prescription drug" includes a controlled substance or other medicine commonly requiring a written prescription from a physician licensed under AS 08.64; "prescription drug" does not include a device or herbal or homeopathic remedy or dietetic substance in a form that is not a controlled substance[8]

In the ensuing years, naturopaths and the Department developed conflicting interpretations of these regulatory definitions. Naturopaths distinguished prescription drugs, which they acknowledged they were not permitted to prescribe or administer, from non-drug prescription medicines, which they interpreted the statute as permitting them to prescribe or administer. Accordingly, Alaska naturopaths routinely administered or prescribed dietetics requiring a prescription, such as injectable vitamins and minerals (e.g., a Vitamin B-12 shot or a magnesium shot).[9] In contrast, the Department interpreted the regulation to prohibit naturopaths from administering and prescribing *all* medicines requiring a prescription, even if the prescription medicine was also a dietetic. These clashing interpretations resulted in some pharmacists refusing to fill prescriptions for naturopaths and the State launching investigations of naturopaths who used prescription medicines and the pharmacists who filled the prescriptions.

In 2012 the Department issued a notice of proposed changes to the regulatory definitions that would clarify naturopaths' prescriptive authority. After the public comment period closed, the Department amended the definitions in two ways to effectively bar naturopaths from using or prescribing any medicine that requires a

---

[8]     Former 12 Alaska Administrative Code (AAC) 42.990 (eff. 7/28/94).

[9]     Apparently injectable vitamins and minerals require a prescription. In contrast, orally administered vitamins and minerals do not require a prescription. Injectable vitamins and minerals are used for patients who have difficulty absorbing orally administered vitamins and minerals, e.g., patients with an impaired stomach lining.

prescription, including dietetics (injectable vitamins and minerals), herbal, and homeopathic remedies.[10]  First, the new regulation broadened the definition of prescription drug so that it encompassed *any* medicine requiring a prescription and no longer excluded dietetics, herbal, and homeopathic remedies:  " '[P]rescription drug' means a controlled substance or other medicine requiring a prescription from a physician licensed under AS 08.64 or from another health care professional authorized to issue prescriptions by the law of this state."[11]  Second, the new regulation explicitly excluded prescription drugs from the definitions of dietetics, herbal remedy, and homeopathic remedy:

> (1) "dietetics"
>
> > (A) includes the use of nutritional therapies, nutritional counseling, nutritional substances, vitamins, minerals, and supplements to promote health and to diagnose, treat, and prevent disease, illness, and conditions;
> >
> > (B) does not include the use of a prescription drug, poison, or controlled substance;
> >
> > . . . .
>
> (3) "herbal remedy"
>
> > (A) includes medicines derived from or a concentrate or extract of a plant, tree, root, moss, fungus, or other natural substance;
> >
> > (B) does not include a prescription drug, poison, or controlled substance;
> >
> > (4) "homeopathic remedy" means a remedy defined in the *Homeopathic Pharmacopoeia of the United States*

---

[10]  12 AAC 42.990 (2014).

[11]  12 AAC 42.990(8).

*Abstracts 1993*, revised as of December 1992 and adopted by reference except for prescription drug, poison, or controlled substance[.][12]

These new definitions went into effect in January 2014.

## B.    Proceedings

In May 2014 the Alaska Association of Naturopathic Physicians[13] filed a declaratory judgment action, seeking a declaration that the new regulation was invalid to the extent it was inconsistent with AS 08.45. Specifically, the Association alleged that the new regulation unduly expanded the statutory prohibition on prescription drugs to include all prescription medicines. It also claimed that the new regulation, which effectively prohibited the use of prescription dietetics, was contrary to the statutory definition of naturopathy, which conferred on naturopaths the unqualified right to use dietetics. Moreover, it urged that the new regulation contravened the longstanding practice and training of naturopaths in Alaska and prevented them from practicing in a manner consistent with their training, experience, and expertise.

In January 2016 the Department filed a motion to dismiss, which the superior court later converted to a motion for summary judgment. After hearing oral argument and receiving supplemental briefing from the Association, the superior court granted the Department's motion. The Department then moved for 20% of its actual attorney's fees under Alaska Civil Rule 82.[14] The Association opposed the motion on

---

[12]    12 AAC 42.990.

[13]    The Association "is an incorporated, non-profit, professional association or organization representing licensed naturopathic doctors who practice their profession in Alaska." According to the Association, its membership is composed of naturopaths practicing in Alaska, totaling approximately 25 individuals.

[14]    *See* Alaska R. Civ. P. 82(b)(2) ("In cases [resolved without trial] in which
(continued...)

the basis that it was a public interest litigant exempt from an adverse attorney's fees award. The superior court rejected this contention, concluding that the Association did not qualify as a public interest litigant because it had sufficient economic incentive to bring the suit. After concluding that the Department's fee request was reasonable, the superior court awarded it $16,844 in fees, 20% of its total fees incurred.

The Association appeals both the grant of summary judgment in favor of the Department and the attorney's fees award.[15]

## III.    STANDARDS OF REVIEW

A regulation's consistency with its enabling statute "is a question of law to which we apply the appropriate standard of review based on the level of agency expertise involved."[16] Here, the parties agree that the new regulatory definitions do not implicate the Department's expertise, so we review them using the substitution of judgment standard.[17] Under this standard we exercise our independent judgment, substituting our "own judgment for that of the agency even if the agency's [interpretation] ha[s] a reasonable basis in law."[18] We will "adopt the rule of law that is most persuasive in light

---

[14]    (...continued)
the prevailing party recovers no money judgment, the court shall award the prevailing party . . . 20 percent of its actual attorney's fees which were necessarily incurred.").

[15]    The Association also appeals the denial of its own motion for summary judgment, which it had filed in June 2015. The Association does not present a separate argument concerning this denial, and our analysis below applies equally to it as to the superior court's grant of summary judgment in favor of the Department.

[16]    *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014).

[17]    *Id.*

[18]    *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903
(continued...)

of precedent, reason, and policy, but in doing so we give due deliberative weight 'to what the agency has done, especially where the agency interpretation is longstanding' "[19] and continuous.[20]

We generally review an attorney's fees award for abuse of discretion, which exists when an award is "arbitrary, capricious, manifestly unreasonable, or the result of an improper motive."[21] Interpretation of the scope of the exception to attorney's fees awards for constitutional claimants is a question of law reviewed de novo.[22]

## IV.   DISCUSSION

### A.   The New Regulation, 12 AAC 42.990, Is Consistent With AS 08.45.

The Association argues that the new regulatory definitions governing naturopaths, codified at 12 AAC 42.990, are inconsistent with the definition of

---

[18]   (...continued)
(Alaska 1987).

[19]   *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 73 (Alaska 2013) (quoting *Chugach Elec. Ass'n v. Regulatory Comm'n of Alaska*, 49 P.3d 246, 250 (Alaska 2002)).

[20]   *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1119 (Alaska 2007). The parties disagree whether the Department's interpretation is due the additional deference accorded to longstanding and continuous interpretations. The Association urges it is not, noting that the new regulation became effective in 2014 and that it altered regulatory language that had been in effect for 20 years. The Department urges that additional deference is nonetheless warranted because the Department's *interpretation* has remained consistent, even though the regulatory text has changed. However, we need not resolve this dispute because the level of deference would not affect our interpretation of the statute in this case.

[21]   *DeVilbiss v. Matanuska-Susitna Borough*, 356 P.3d 290, 294 (Alaska 2015) (quoting *Bachner Co. v. Weed*, 315 P.3d 1184, 1189 (Alaska 2013)).

[22]   *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 279 (Alaska 2015).

naturopathy and the restrictions on naturopaths outlined in the naturopathy statute, AS 08.45. We have not previously interpreted the scope of naturopaths' prescribing authority under AS 08.45. When determining a statute's meaning, we consider three factors: "the language of the statute, the legislative history, and the legislative purpose behind the statute."[23] "We decide questions of statutory interpretation on a sliding scale"[24]: "[T]he plainer the language of the statute, the more convincing any contrary legislative history must be . . . to overcome the statute's plain meaning."[25] Moreover, "[a] party challenging a regulation bears the burden of showing that adoption of the regulation is inconsistent with the . . . statute."[26]

The Association argues that the new regulation is inconsistent with the statute's ban on naturopaths using and prescribing prescription drugs because it prohibits naturopaths from using and prescribing *all* prescription "medicine," not just prescription *drugs*. The statute, in a section entitled "Restrictions on practice of naturopathy," states that naturopaths may not "give, prescribe, or recommend . . . a prescription drug."[27] The new regulation defines "prescription drug" as "a controlled substance or other medicine requiring a prescription from a physician licensed under AS 08.64 or from another health

---

[23]     *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 595 (Alaska 2012) (quoting *Shehata v. Salvation Army*, 225 P.3d 1106, 1114 (Alaska 2010)).

[24]     *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[25]     *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991).

[26]     *Grunert v. State*, 109 P.3d 924, 937 (Alaska 2005).

[27]     AS 08.45.050(1)(A).

care professional authorized to issue prescriptions by the law of this state."[28] Unlike the old regulation, it does not exclude "herbal or homeopathic remed[ies]" and "dietetic substance[s]" from the definition.[29] In other words, the new regulation categorically defines prescription drug to include *any* medicine requiring a prescription. But according to the Association, there is a real distinction between a prescription "medicine" and a prescription "drug," with natural substances and their derivatives (such as injectable vitamins and minerals) falling in the former category but not the latter.

### 1. Statutory text and structure

The text of the naturopathy statute does not provide, and the Association does not cite, any support for distinguishing between a prescription drug (which the Association concedes a naturopath is forbidden from prescribing) and prescription medicines composed of natural substances or their derivatives. As an initial matter, the statute does not define the term "prescription drug" or its constituent words. In the absence of a definition, we construe statutory terms according to their common meaning.[30] Dictionaries "provide a useful starting point for [determining]" a phrase's common meaning.[31] Black's Law Dictionary's definition of "drug" does not exclude natural substances or their derivatives. It defines "drug" as (1) "[a] substance intended for use in the diagnosis, cure, treatment, or prevention of disease" and (2) "[a] natural or

---

[28]   12 AAC 42.990(8).

[29]   Former 12 AAC 42.990(8) (eff. 7/28/94).

[30]   *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 16 (Alaska 2014).

[31]   *Alaskans for Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 276 n.4 (Alaska 2004).

synthetic substance that alters one's perception or consciousness."[32] This definition suggests that the common meaning of "prescription drug" does not exclude natural substances.

The overall structure and substance of AS 08.45 also provide insight into the meaning of "prescription drug," and they too provide no basis for distinguishing between prescription drugs and other prescription medicines composed of natural substances. The only mention of prescriptions or prescribing authority in AS 08.45 is to ban naturopaths from prescribing drugs; nowhere else does the naturopathy statute refer to prescribing authority or prescription substances. If the legislature's intention were to convey to naturopaths broad prescribing authority for non-drug prescription medicines, it would be odd for the statute to mention this authority only in the context of constraining it. Given that the only mention of naturopath prescribing authority is in the context of circumscribing it, the naturopath statute as a whole does not evince an intent to allow naturopath use of other prescription substances.

Comparing the language of the naturopath statute to that of the licensing statutes governing healthcare professionals who unequivocally have prescribing authority also provides insight into the scope of the term "prescription drug." In marked contrast to the naturopath statute, the statutes governing the licensing of doctors and osteopaths,[33] dentists,[34] veterinarians,[35] registered nurses,[36] and advanced nurse

---

[32]    *Drug*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[33]    AS 08.64.380(6)(A) (defining the "practice of medicine" and the "practice of osteopathy" to include "prescrib[ing] for . . . any human ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other mental or physical condition").

[34]    AS 08.36.360(2) (defining the "practice of dentistry" to include "prescrib[ing] for a disease, lesion, pain, injury, deficiency, deformity, or physical
(continued...)

-11-                                                                            **7229**

practitioners[37] all explicitly define their respective practices to include some degree of prescribing authority. These statutes suggest that where the legislature intends to convey prescribing authority, it does so explicitly. The statutory definition of the practice of naturopathy conveys no such explicit prescribing authority, indicating that no such authority was intended to be conveyed.

This conclusion is underscored by a 1985 attorney general opinion "concerning persons who may initiate prescriptions."[38] Although they are not controlling, we generally afford opinions of the Attorney General "some deference."[39] The opinion responds to a question from the Department querying whether healthcare boards had the authority to grant prescriptive authority to healthcare professionals via regulations. The opinion first notes that "[t]he [statutory] definitions of what activities constitute a particular profession appear to be the best reference for determining who is

---

[34]     (...continued)
condition, malocclusion or malposition of the human teeth").

[35]     AS 08.98.250(5)(A)(i) (defining the "practice of veterinary medicine" to include "prescription . . . of a drug, biologic apparatus, anesthetic, or other therapeutic or diagnostic substance").

[36]     AS 08.68.850(11)(F) (defining the "practice of registered nursing" to include "the prescription of medical therapeutic or corrective measures under regulations adopted by the [Board of Nursing]").

[37]     AS 08.68.850(9) (defining the "practice of advanced practice registered nursing" to include "the prescription and dispensing of medical, therapeutic, or corrective measures under regulations adopted by the [Board of Nursing]").

[38]     [1985] 1 INFORMAL OP. ATT'Y GEN. 197.

[39]     State v. Dupier, 118 P.3d 1039, 1050 n.62 (Alaska 2005).

authorized to issue a prescription."[40] It concludes that for a healthcare board to grant prescriptive authority by regulation, the board "must have a statutory basis for the action."[41] Therefore, according to this Attorney General opinion, prescriptive authority must have a statutory basis in the definition of the practice. As discussed above, however, the definition of the practice of naturopathy provides no such statutory basis.

The Association nonetheless contends that the legislature intended to convey to naturopaths prescribing authority for some non-drug substances by including "dietetics" in the statutory definition of "naturopathy." It argues that because some dietetics, such as injectable vitamins and minerals, require a prescription, the inclusion of dietetics in the statutory definition of naturopathy evinces legislative intent to convey prescribing authority. However, we conclude that the inclusion of this term does not provide a statutory basis for prescriptive authority, especially when it is read in light of the more specific statutory prohibition on naturopath use of prescription drugs. First, as discussed above, in other statutes governing medical professions, the legislature conveyed prescriptive authority explicitly through the use of words such as "prescription" and "prescribe." Therefore, when the legislature wishes to convey prescribing authority, it does so clearly and explicitly rather than opaquely. In addition, only a subset of dietetics require a prescription, meaning it is possible to use some dietetics without any prescriptive authority. It is thus possible to interpret the statute as not conveying prescriptive authority to naturopaths without rendering the inclusion of "dietetics" in the statutory definition a nullity.

The Association's argument regarding the statutory definition additionally falters when considered against the backdrop of the naturopath statute as a whole.

---

[40]     [1985] 1 INFORMAL OP. ATT'Y GEN. 197.

[41]     *Id.* at 199.

"When a statute . . . is part of a larger framework or regulatory scheme, [it] must be interpreted in light of the other portions of the regulatory whole."[42] Although various statutory sections should be harmonized when possible, more specific sections control over general sections.[43] Here, the statutory definition of "naturopathy" appears in a general section: the definitions section that applies to the entirety of AS 08.45.[44] In contrast, the statutory prohibition on prescription drugs appears in a specific, standalone section entitled "Restrictions on practice of naturopathy."[45] The inclusion of dietetics in the general statutory definition of naturopathy should be understood as being modified by the specific prohibition on naturopath use of prescription drugs. In other words, together, the two statutory sections provide that naturopaths can practice the methods listed in the definition of naturopathy to the extent those methods do not include prescription of drugs. This interpretation does not bring the two sections into conflict but merely recognizes that one specific section cabins a general term in the other.

### 2. Legislative history

The legislative history of AS 08.45 only confirms the indication of the statutory text that naturopaths lack any prescribing authority. When the bill that was ultimately enacted as AS 08.45, Senate Bill (S.B.) 297, was initially introduced in 1985, it explicitly included some prescriptive authority for naturopaths. In a section entitled "Scope of Naturopathic Practice," the bill provided that naturopaths could, among other

---

[42] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017) (quoting *Millman v. State*, 841 P.2d 190, 194 (Alaska App. 1992)).

[43] *Nelson v. Municipality of Anchorage*, 267 P.3d 636, 642 (Alaska 2011).

[44] AS 08.45.200.

[45] AS 08.45.050.

things, "write prescriptions for substances authorized by this chapter."[46] The initial bill also included a section restricting the practice of naturopathy, but with a narrower ban on prescriptive authority: "A naturopath may not . . . use drugs, except local anesthetics, minerals, and extracts, compounds or concentrates obtained from plants or animals."[47] The initial bill thus provided a carve-out for drugs composed of natural substances and would have allowed naturopaths to use and prescribe injectable vitamins and minerals.

Shortly after this initial bill was introduced, the Department of Health and Social Services submitted a position paper expressing reservations about certain aspects of the bill.[48] The paper noted some "controversy over the scientific basis of naturopathic medicine" and expressed the agency's concern over allowing naturopaths to treat certain types of illnesses given the limits of the naturopathic approach.[49] Although the agency concluded it was "neutral on th[e] bill," it noted that other states placed more restrictive conditions on naturopaths by, for example, forbidding naturopaths from using drugs and from performing surgery.[50]

About a year later, a sponsor substitute to S.B. 297 was introduced that omitted the section entitled "Scope of Naturopathic Practice," thereby eliminating the original bill's affirmative grant of authority for naturopaths to write prescriptions.[51] The sponsor substitute also amended the section restricting the practice of naturopathy to

---

[46]    S.B. 297, 14th Leg., 1st Sess. § 2, at 4 (Apr. 23, 1985).

[47]    *Id.* § 2, at 5.

[48]    Dep't of Health & Soc. Servs., Position Paper, S.B. 297 (Apr. 30, 1985).

[49]    *Id.*

[50]    *Id.*

[51]    Sponsor Substitute for Senate Bill (S.S.S.B) 297, 14th Leg., 2d Sess. (Apr. 17, 1986).

narrow the drugs that naturopaths were permitted to use and prescribe, still permitting the prescription of natural substances: "[A] person who practices naturopathy may not . . . use in the practice or prescribe . . . a prescription drug other than a natural plant, animal, or mineral substance."[52] But then the committee substitute for the sponsor substitute made the ban on using and prescribing prescription drugs entirely unconditional: "A person who practices naturopathy may not . . . give, prescribe, or recommend in the practice . . . a prescription drug . . . ."[53] It was this language that was enacted into law later that year, codified in AS 08.45.050.[54]

The path of this legislative history suggests that the legislature did not intend for the statute to convey any prescribing authority to naturopaths. The bill drafting process shows the legislature gradually winnowed the substances for which naturopaths could write prescriptions from some natural substances, to fewer natural substances, to an unconditional ban on prescription drugs. If the legislature wished to draw a distinction in the statute between prescription natural substances and prescription drugs, it would have retained the language of the initial bill, which drew this precise distinction. Further, the drafting process shows that the legislature stripped language from the bill that explicitly defined the scope of naturopath practice to include writing prescriptions. Given the removal of this language, it is unlikely that the legislature intended to nonetheless convey some prescriptive authority to naturopaths by including "dietetics" in the definition of "naturopathy." Moreover, these changes were made against the backdrop of the Department of Health and Social Services expressing concern

---

[52] *Id.* § 1, at 2.

[53] Committee Substitute for Sponsor Substitute for Senate Bill (C.S.S.S.S.B.) 297, 14th Leg., 2d Sess. § 8, at 3 (1986).

[54] Ch. 56, § 1, SLA 1986.

about the scope of naturopath prescribing authority. Thus the statute's legislative history provides additional evidence that the legislature did not intend to convey any prescriptive authority to naturopaths.

In sum, neither the text nor overall structure of AS 08.45 indicates that it conveys to naturopaths the authority to prescribe natural substances, including injectable vitamins and minerals. This conclusion is further bolstered by comparing the naturopath statute to those statutes governing other professionals and by reviewing the legislative history of AS 08.45, which excised language that would have conveyed some degree of prescribing authority to naturopaths. The new regulation, which effectively prohibits naturopaths from using all prescription medicines, is therefore consistent with AS 08.45.

## B. The Association Has Waived Its Challenge To The Attorney's Fees Award.

The Association also seeks to challenge the superior court's attorney's fees award. It argues that it is exempt from attorney's fees under the public interest litigant exception.[55] But this common law exception was abrogated by statute in 2003.[56] The current version of the exception, as codified at AS 09.60.010(c), allows a constitutional

_____

[55] *See Miller v. Matanuska-Susitna Borough*, 54 P.3d 285, 293 (Alaska 2002) (" 'It is an abuse of discretion to award attorney's fees against an unsuccessful public interest plaintiff who raises a claim in good faith.' A four-part test determines public interest litigant status: (1) Is the case designed to effectuate strong public policies? (2) If the plaintiff succeeds, will numerous people receive benefits from the lawsuit? (3) Can only a private party have been expected to bring this suit? (4) Would the purported public interest litigant have sufficient economic incentive to file suit even if the action involves only narrow issues lacking general importance?" (footnote omitted) (quoting *Carr-Gottstein Props. v. State*, 899 P.2d 136, 147 (Alaska 1995))), *superseded by statute*, ch. 86, SLA 2003, *as recognized in Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 258 (Alaska 2009).

[56] *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 280 (Alaska 2015).

-17- **7229**

claimant to avoid an adverse attorney's fees award under certain circumstances, but the Association did not rely on this statute in its response to the Department's motion for attorney's fees or in its original brief on appeal. And at oral argument, the Association conceded that its complaint did not raise any constitutional claims. We thus conclude that the Association has waived and abandoned any challenge to the attorney's fees award.

## V. CONCLUSION

We AFFIRM the superior court's judgment.